IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CAROL WILLIAMS,<br><br>        Plaintiff,<br><br>v.<br><br>KAISER FOUNDATION HEALTH<br>PLAN OF GEORGIA, INC.,<br><br>        Defendant. | CIVIL ACTION FILE NO.<br><br>1:22-cv-2744-SDG-JKL |

## FINAL REPORT AND RECOMMENDATION

This is an employment case in which Plaintiff Carol Williams alleges that her former employer, Defendant Kaiser Foundation Health Plan of Georgia, Inc., discriminated against her and failed to provide her with a reasonable accommodation in violation of the Americans with Disabilities Act ("ADA"); interfered with her rights under the Family and Medical Leave Act ("FMLA"); and unlawfully terminated her employment in retaliation for engaging in protected activity under the ADA and the FMLA.  The case is before the Court on Defendant's Motion for Summary Judgment.  [Doc. 22.]  For the reasons that follow, it is **RECOMMENDED** that the motion be **GRANTED**.

## I.     FACTS[1]

### A.     Plaintiff's Medical Conditions

Plaintiff is a licensed practical nurse ("LPN").  (Dep. of Pl. [Doc. 31-1] at 19.)  She suffers from several serious medical conditions, including migraines and irritable bowel syndrome ("IBS"), which can cause unpredictable flare-ups and force her to miss work and recuperate from home.  (DSUMF ¶¶ 1-3, 6-7.)  While Plaintiff is aware of certain triggers for her IBS, her flares remain unpredictable, and there is no way to know how long they might last.  (DSUMF ¶ 6; R-DSUMF ¶ 6.)  When Plaintiff suffers an IBS flare at work, she must go home to recuperate. (DSUMF ¶ 7.)

---

[1] In setting out the facts of this case, the Court has considered Defendant's Statement of Undisputed Material Facts ("DSUMF" [Doc. 22-2]), Plaintiff's Statement of Additional Material Facts ("PSAMF" [Doc. 25 at 32-39]), and the responses thereto ("R-DSUMF" [*id.* at 1-32] and "R-PSAMF" [Doc. 28-1]). Where possible, the Court has relied on those statements of facts and responses. The Court does not rule on each and every objection or dispute presented by the parties in this report and recommendation, and discusses objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.  The Court has also conducted its own review of the materials submitted in support, including the depositions and declarations filed in this case, and includes facts drawn from its independent review of the record.  *See* Fed. R. Civ. P. 56(c)(3). Where there is a conflict in the evidence, the Court accepts Plaintiff's evidence as true because she is the non-moving party.  *See Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000) ("If there is a conflict between the plaintiff's and the defendant's allegations or in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor.").

Plaintiff began her employment with Defendant in 2016. (Pl. Dep. at 18-19.) Over the following five years she worked in a variety of nursing positions. (*Id*. at 19-25.) In October 2021, ostensibly due to her medical issues, Defendant placed her on leave so that she could find another position within the organization. (Dep. of Angenetta Dandy [Doc. 32-5] at 39; DSUMF ¶ 79.) Plaintiff was unable to find an alternative position, and on February 10, 2022, Defendant terminated her employment. (PSAMF ¶¶ 125, 126.) Plaintiff's supervisor was Thomas Bodie. (Pl. Dep. at 25-26; Decl. of Thomas Bodie [Doc. 22-3] ¶ 2.)

### B.   Defendant's Process for Authorizing FMLA Leave and ADA Accommodations

Defendant maintained a process for employees to obtain approval to take leave under the FMLA. (DSUMF ¶ 8.) First, the employee's supervisor initiated a request for FMLA leave on the employee's behalf in Defendant's HR system. (DSUMF ¶ 8.) Next, the employee was required to obtain a medical certification from the appropriate medical provider and submit it to Defendant's National HR Service Center. (DSUMF ¶¶ 9-10.) The National HR Service Center then reviewed the certification paperwork and notified the employee's supervisor whether the FMLA leave request was approved or denied. (DSUMF ¶ 11.) If approved, the National HR Service Center calculated the number of leave hours that were authorized and the period during which the hours could be used. (DSUMF ¶ 12.)

3

Defendant tracked employees' use of FMLA leave using a rolling calendar year method, beginning on the date that the employee first used leave. (DSUMF ¶ 13.) Re-approval was not automatic. For example, if an employee had an ongoing illness that extended beyond the rolling calendar year and the employee believed additional FMLA leave was needed, the employee was required to recertify the condition with new paperwork from a provider. (DSUMF ¶ 16.) Plaintiff understood that it was her obligation to get the recertification paperwork from her physician and provide it to Defendant. (DSUMF ¶ 17.)

Plaintiff took FMLA leave between 2017 and 2021 (DSUMF ¶ 18; PSAMF ¶ 105), with her recertification period resetting at the end of each September. (DSUMF ¶ 18). She was approved for 480 hours of intermittent FMLA leave in September 2020 for the period from October 1, 2020 through September 22, 2021, the maximum she was allowed by statute; and was again approved for roughly 400 remaining hours in November 2020.[2] (PSAMF ¶ 107; *see also* Doc. 32-2 at 1-4 (authorizations for FMLA leave).) It is undisputed that she exhausted all that leave before the end of September 2021. (Dep. of Thomas Bodie [Doc. 32-7] at 61-62 & Ex. 1; Dandy Dep. at 30.) She did not give Defendant any recertification

---

[2] *See* 29 U.S.C. § 2612(a)(1).

paperwork for any FMLA-qualifying condition after September 2021, however. (DSUMF ¶ 18.)

Requests for accommodations under the ADA were handled differently. If an employee requested an accommodation, Angenetta Dandy, a "Leave and Disability Management Consultant" in Defendant's HR department, would give the employee a "Medical Inquiry Form For Employee ADA Accommodation Request" ("ADA Job Accommodation Form") so that a physician could document the existence and extent of disability. (*See* Dandy Dep. at 9-10; DSUMF ¶ 21; *see also* Pl. Dep. Ex. 1A [Doc. 31-3] (ADA Job Accommodation Form completed by Plaintiff).) Upon receipt of a completed form and any medical documentation, Dandy would determine the reasonableness of an accommodation. (DSUMF ¶¶ 22, 23; R-DSUMF ¶ 23.) In addition, she would consult with the manager over the department in which the employee worked so that the manager could also give input on the feasibility of the requested accommodation. (DSUMF ¶¶ 24, 25.)

### C.   The Events Giving Rise to This Action

In August 2021, Defendant assigned Plaintiff to work in an outdoor COVID testing tent at its TownPark facility. (DSUMF ¶ 26.) Plaintiff expressed concerns to Nurse Manager Kim Fowler that she might not have access to a bathroom while working in the tent. (DSUMF ¶¶ 26, 27; PSAMF ¶ 111.) Thinking that Plaintiff was asking for scheduled bathroom breaks, Fowler asked Plaintiff to provide a

doctor's note supporting the request.  (DSUMF ¶ 28.)  Plaintiff complied, and she presented a doctor's note to Fowler that stated she needed to have access to a bathroom.  (Dandy Dep. at 27.)  Plaintiff soon realized, however, that there had been a miscommunication—Fowler thought Plaintiff was seeking scheduled or timed bathroom breaks when, in fact, she was asking for access to a bathroom on an as-needed basis.  (DSUMF ¶ 29.)  Having cleared up that misunderstanding, Fowler told Plaintiff she could take a restroom break whenever she needed, and Plaintiff never had any issue with bathroom access.[3]  (DSUMF ¶ 30.)

Meanwhile, sometime between mid-August and September 1, 2021, Dandy emailed Plaintiff concerning her request for bathroom access.  (DSUMF ¶ 31; Dandy Dep. at 29.)  Dandy explained that even though the bathroom access issue had been addressed, Defendant still needed to determine if there were any other accommodations Plaintiff required for her medical conditions.  (DSUMF ¶ 32; Pl. Dep. at 58.)  Dandy gave Plaintiff a blank ADA Job Accommodation Form and asked Plaintiff to have her doctor complete it.  (DSUMF ¶ 33; Pl. Dep. at 41.)

Plaintiff's doctor, Dr. Jacinto del Mazo, completed the form on September 14, 2021.  (DSUMF ¶ 34; *see also* Pl. Dep. Ex. 1A [Doc. 28-3] (completed form).)  In it, he indicated that Plaintiff had a permanent impairment affecting the major life

---

[3] In all, Plaintiff worked in the COVID testing tent twice.  (Pl. Dep. at 52-53.)

activities of interacting with others, performing manual tasks, standing, working and eating; that she was substantially limited in one or more of these activities; that her impairments interfered with her ability to perform her job functions; and that if Plaintiff experienced a flare-up, she would be unable work and would need to stay at home to recover on bedrest.  (DSUMF ¶¶ 35-38; *see also* Pl. Dep. Ex. 1A.)  In the portion of the form that asked Dr. del Mazo to "state any suggestions regarding possible accommodation(s) to improve the employee's ability to perform his/her job," he wrote that if Plaintiff had "a severe flare-up at work and she's unable to work please allow her to recover at home." (DSUMF ¶ 39; *see also* Pl. Dep. Ex. 1A.)  Plaintiff did not disagree with anything Dr. del Mazo wrote in the form. (DSUMF ¶ 40.)

After receiving Dr. del Mazo's responses, Bodie and his supervisor, Reshunda Redmund, conferred and concluded that in a face-to-face ambulatory setting, Plaintiff's limitations would interfere with her ability to do her job. (DSUMF ¶ 41.)  Of particular concern was Plaintiff's difficulty standing and/or walking because if Plaintiff experienced a flare-up and fell while attending to an unstable patient, the patient might fall as well.  (DSUMF ¶ 42.[4])  Bodie was also

---

[4] Plaintiff generally denies that she posed a risk to her patients and denies that Bodie correctly interpreted her doctor's statements.  (R-DSUMF ¶ 42.)  It is undisputed, however, that Bodie was made aware of a situation when Plaintiff did in fact fall down while at work.  (DSUMF ¶¶ 43-44.)

concerned by Plaintiff's identified limitation with interacting with others because Plaintiff worked in an ambulatory facility where patients were seen face-to-face. (DSUMF ¶ 45; R-DSUMF ¶ 45; Bodie Dep. at 59, 107.)  Bodie concluded that the limitations that Plaintiff's doctor had identified meant she could not perform her job as an ambulatory nurse.  (DSUMF ¶ 46; R-DSUMF ¶ 46; Bodie Dep. at 76-77.)

On September 29, 2021, Plaintiff met with Bodie, Redmund, and Dandy to go over her doctor's completed form.  (DSUMF ¶ 47.)  Bodie and Redmond explained their conclusion that Defendant could not have an ambulatory nurse with Plaintiff's restrictions working in that department.  (DSUMF ¶ 48; R-DSUMF ¶ 48.)  Plaintiff responded that the doctor did not say that she was unable to perform her duties, only that she would need an accommodation if she had a flare-up. (DSUMF ¶ 49; *see also* R-DSUMF ¶¶ 45, 46, 48, 49.)  Plaintiff recognized, however, that the only accommodation Defendant could provide when she was having a flare-up was to send her home.  (DSUMF ¶ 50.)

Regular attendance was an essential function of Plaintiff's LPN job under Bodie.  (DSUMF ¶ 51.)  Plaintiff was not able to predict when the flare-ups were going to occur, or how long they would last.  (DSUMF ¶ 52.)  Bodie told Dandy that it would be infeasible to grant Plaintiff unstructured, intermittent leave because unpredictable absences made it difficult to plan for business operations on a day-to-day basis, particularly since Defendant was short-staffed in the middle of the

COVID pandemic.  (DSUMF ¶ 53; *see also* PSAMF ¶ 110.)  Bringing in PRN (that is, as-needed) nurses when Plaintiff needed to leave or was suddenly absent was also not feasible because it was difficult to find nurses that wanted to work on a PRN basis.  (DSUMF ¶ 54.)  At the time, two PRN nurses worked in Bodie's department, but those nurses also worked at all eight of Defendant's facilities in the relevant geographical area.  (DSUMF ¶ 55.)  And while Defendant could move employees between facilities to the one with the greatest need, Bodie's facility (the TownPark facility) was the largest in the area, so it would typically send resources to other sites, rather than receive them.  (DSUMF ¶ 56.)  From Bodie's perspective, then, it was not "realistic" to send a worker from a smaller facility to a larger facility to cover a need.  (DSUMF ¶ 57; R-DSUMF ¶ 57.)

Dandy recommended, and Bodie agreed, to place Plaintiff on a 90-day leave of absence so that she could find another position within the organization that met her qualifications and medical limitations.  (DSUMF ¶ 63.)  According to Dandy, Plaintiff was placed on leave because her request for unstructured intermittent time off was an issue for the business units to evaluate because they were somewhat short-staffed in the midst of the COVID pandemic.  (PSAMF ¶ 120; *see also* Dandy Dep. at 34-35.)

Dandy advised Defendant's "Talent Acquisition (Recruiting)" department that Plaintiff was looking for a new position and scheduled an initial meeting with

Plaintiff on October 4, 2021, to review open job listings.  (DSUMF ¶ 64.)  In advance of that meeting, Dandy asked Plaintiff to review the open job listings and note all of the positions that she believed she might be qualified for and able to perform with or without accommodations.  (DSUMF ¶ 65.)  Dandy pledged to work with the necessary individuals to follow up on any positions that Plaintiff identified and to update Plaintiff with open positions on a bi-weekly basis.  (DSUMF ¶ 66.)  Dandy asked Plaintiff to continue reviewing potential jobs on a bi-weekly basis until she identified and secured a new role, or until the end of the 90-day job search phase.  (DSUMF ¶ 67.)  Plaintiff understood that if she had not secured a new position by January 4, 2022, her employment would be terminated.  (*Id.*; R-DSUMF ¶ 67; *see also* Pl. Dep. at 98.)  Before the October 4 meeting, Dandy also provided Plaintiff with a list of job openings.  (DSUMF ¶ 68.)  In addition to those jobs that were on Dandy's list, Plaintiff looked at and pursued other positions. (DSUMF ¶ 69.)

At the October 4 meeting, Dandy explained the job search/reassignment process to Plaintiff.  (DSUMF ¶ 70.)  Plaintiff asked questions about FMLA and recertification for additional FMLA leave.  (DSUMF ¶ 71.)  Dandy told Plaintiff that she had exhausted all 480 hours of FMLA leave and that the job accommodation was initiated in light of Plaintiff having no more FMLA leave hours available.  (DSUMF ¶ 72; *see also* Pl. Dep. Ex 2 [Doc. 31-4 (notes from Oct.

4, 2021 meeting).)  Plaintiff understood that she was to follow up with the National HR Service Center regarding the status of her FMLA leave to see if it had been recertified for another year.  (DSUMF ¶ 74.)

Between September 29, 2021 and the end of 2021, Plaintiff met weekly with Dandy to discuss the applications Plaintiff had made.  (DSUMF ¶ 81.)  Dandy notified the recruiter that Plaintiff was entitled to preferential consideration and treatment.  (DSUMF ¶ 82.)  Dandy suggested that Plaintiff take a part-time position.  (PSAMF ¶ 121.)  Plaintiff did not apply for any part-time positions because it would impact her insurance, her eligibility for FMLA leave, and her salary.  (*Id.*; Pl. Dep. at 169.)

Dandy spoke with the managers of departments to which Plaintiff was potentially qualified to transfer, and each told Dandy they were not able to provide an accommodation that involved unstructured time off.  (DSUMF ¶ 85; *see also* Dandy Dep. at 71-72, 81-82 (identifying positions as a surgery coordinator, an LPN role in surgery, and a call center coordinator).)  Dandy did not notify any of those managers that Plaintiff was eligible for intermittent FMLA leave.  (PSAMF ¶ 122; R-DSUMF ¶ 85.)  Dandy explained at her deposition that she did not tell any of the managers that Plaintiff was eligible for FMLA leave because she and Bodie confirmed with Defendant's National HR Service Center, which handled requests

for FMLA leave, that she was not eligible for leave at that time, having exhausted her then-present entitlement.  (Dandy Dep. at 73-75.)

For each of the positions Plaintiff applied for, it is undisputed that regular attendance was an essential job duty.  (DSUMF ¶ 88.)  But if one of those positions had been offered to Plaintiff, Plaintiff testified that she would have managed her flare-ups through intermittent FMLA leave.  (DSUMF ¶ 89; Pl. Dep. at 124.)  Plaintiff, however, did not have any FMLA leave available, and Bodie testified that he could not predict whether she would qualify for FMLA leave in the future.  (DSUMF ¶ 90; R-DSUMF ¶ 90; Bodie Dep. at 51.)

On December 15, 2021, Plaintiff told Dandy that she wanted an assessment of her FMLA status.  (DSUMF ¶ 92; *see also* DSUMF ¶¶ 75-76.)  Dandy instructed Plaintiff to have Bodie submit a new request for FMLA leave so that the National HR Service Department could re-assess Plaintiff's eligibility.  (DSUMF ¶ 93.)  To ensure that the request had been made, Dandy followed up with Bodie to confirm.  (DSUMF ¶ 94; Dandy Dep. at 89.)  Bodie submitted the new request to the National HR Service Center.  (DSUMF ¶ 95.)  The National HR Service Center denied the request for FMLA leave on January 10, 2022, because Plaintiff had never provided any kind of recertification paperwork after September 29, 2021.  (DSUMF ¶¶ 96-97; PSAMF ¶ 124.)

By January 10, 2022, Plaintiff had been rejected from each of the jobs to which she had applied and was not permitted to return to her previous position. (PSAMF ¶ 125.)  Even so, Bodie did not terminate her employment until February 10, 2022.[5]  (PSAMF ¶ 126.)  Bodie terminated her employment because he concluded based on the doctor's letter that Plaintiff would not be able to work as a nurse with the limitations that were listed as occurring during her flare-ups. (PSAMF ¶ 134.)  Bodie did not ask for any clarification of the limitations listed in the doctor's form responses.  (PSAMF ¶ 135.)

### D.   Procedural Posture

Plaintiff filed this action on July 13, 2022, and asserted the following six claims:

- Count One:  ADA discrimination for terminating her employment;

- Count Two:  ADA discrimination for failing to hire her for any of the positions to which she applied;

- Count Three:  denial of a reasonable accommodation under the ADA;

- Count Four:  ADA retaliation for requesting a reasonable accommodation;

- Count Five:  FMLA interference by terminating her employment; and

---

[5] In all, Defendant provided Plaintiff 130 days to find a new position rather than 90 as initially planned.  (DSUMF ¶ 98; R-DSUMF ¶ 98.)

- Count Six: FMLA retaliation exercising her statutorily-protected rights. [Doc. 1.]

On July 5, 2023, Defendant filed its motion for summary judgment. [Doc. 22.] In it, Defendant argues that Plaintiff's ADA discrimination and failure-to-accommodate claims fail as a matter of law because she was not a "qualified individual" under the ADA; or, alternatively, because she cannot show that her disability was the but-for cause of any action that Defendant took. [Doc. 22-1 at 19-22.] As to Plaintiff's FMLA interference claim, Defendant argues that it is undisputed that she received all of the FMLA leave to which she was entitled and that at the time of her job search phase and termination, she was not entitled to any additional FMLA leave. [*Id.* at 23-24.] Finally, as to the FMLA and ADA retaliation claims, Defendant argues that Plaintiff was terminated because she did not secure a job consistent with her medical limitations, and that she was denied FMLA leave because she did not submit the required recertification documentation to become eligible for FMLA leave after September 2021. [*Id.* at 24.]

Plaintiff counters that she was a qualified individual under the ADA because she could satisfactorily perform the job duties associated with her position with intermittent leave and because she was denied a reasonable accommodation—that is, intermittent leave—and instead placed on involuntary leave to search for other positions. [Doc. 24 at 12-16.] She also argues that she had presented direct

14

evidence of discrimination since Defendant admits that it fired her and refused to hire her for different positions due to her disability-related limitations.  [*Id.* at 17-18.]  As for her FMLA interference claim, Plaintiff argues that Defendant interfered with her ability to obtain reauthorization of her FMLA leave and by failing to tell any of the hiring managers that if she were hired into a new position, she could become eligible for intermittent FMLA leave.  [*Id.* at 9-12.]  And with regard to her retaliation claims, she contends that she can show unlawful retaliation because, shortly after she submitted paperwork from Dr. del Mazo showing that she was entitled to intermittent leave due to her conditions, Defendant involuntarily placed her on leave and ultimately fired her when she could not secure another position.  [*Id.* at 21-23.]  She further argues that Defendant's reasons for placing her on leave and firing her are pretext for retaliatory animus.  [*Id.* at 23-24.]

After the close of summary judgment briefing (and at the direction of the Court), the parties supplemented the record with exhibits and deposition transcripts that had been either omitted or filed under seal.  [*See* Docs. 30, 31, 32.]  Defendant's summary judgment motion is now ripe for resolution.

## II.    SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is

entitled to summary judgment. *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary

judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## III.  DISCUSSION

### A.  ADA Discrimination and Failure-to-Accommodate

In the employment context, the ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on an ADA disability discrimination claim, a plaintiff must show (1) she has a disability, (2) she was a "qualified individual" at the relevant time, and (3) she was subject to unlawful discrimination because of her disability. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023).

Defendant argues that even if Plaintiff were disabled under the ADA, she still was not a "qualified individual," since it is undisputed that regular attendance

was an essential function of the nursing job she held (as well as an essential function of the other jobs she applied for during her job search), but one she could not meet based upon the "serial and sporadic" absences she had as a result of her flare-ups. [Doc. 22-1 at 20.] Defendant contends that no accommodation would address the unpredictable nature of Plaintiff's absences, and that it would be an undue hardship to have a nurse available on standby to fill in immediately for Plaintiff if and when she needed to leave work suddenly. [*Id.* at 21.]

Plaintiff responds that she was "undoubtedly qualified for her position" because she was a licensed practical nurse, she had served in the position for four years, and during that time, she consistently received successful performance reviews. [Doc. 24 at 14.] She further argues that she was performing her duties when she was "involuntarily placed on leave." [*Id.*] Plaintiff highlights that the only instance for which she was reprimanded for taking leave occurred in December 2019, when she was written up for violating Defendant's attendance policy, but that since then, she had not taken FMLA leave beyond what she was entitled to take. [*Id.* at 15-16.]

The undersigned concludes that Defendant has the better of the arguments. The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Therefore,

"[t]o survive summary judgment, a plaintiff must show there is a genuine issue as to whether she either 'can perform the essential functions of her job without reasonable accommodation, or failing that, can perform the essential functions of her job with a reasonable accommodation.'" *Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 942-43 (11th Cir. 2017) (cleaned up) (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007)). "What constitutes a reasonable accommodation depends on the circumstances, but it may include . . . part-time or modified work schedules . . . among other things." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).

Unfortunate for Plaintiff's argument, "[i]n this Circuit, where an employee's regular attendance is an essential function of her job and the employee's absences are serial and sporadic, the employee is not an 'qualified individual' for purposes of a discrimination or failure to accommodate claim." *Aponte v. Akima Glob. Servs. LLC*, No. 17-24184-CIV-MARTINEZ-Otazo-Reyes, 2022 WL 2289646, at *11 (S.D. Fla. May 31, 2022) (collecting cases). For example, in *Jackson v. Veterans Administration*, the Court of Appeals concluded that an employee's serial absenteeism prevented him from performing the essential functions of his job with the Veterans Administration ("VA").[6] *See* 22 F.3d 277, 278-79 (11th Cir. 1994).

---

[6] In *Jackson*, the plaintiff alleged disability discrimination under the Rehabilitation Act of 1973. *See* 22 F.3d at 278. Nevertheless, the court's reasoning

The plaintiff in that case suffered from degenerative rheumatoid arthritis, which caused him to miss six days of work during a three-month initial probationary period.  *Id.* at 278.  Although Plaintiff was able to perform his job satisfactorily when he was at work, it was an essential function of his job that he be present at work on a routine basis, and his "sporadic, unpredictable" absences prevented him from fulfilling that essential function.  *Id.* at 278-79.  Further, none of the accommodations the plaintiff requested—including allowing plaintiff to swap off days with other employees if he experienced a flare-up of his symptoms—were considered reasonable by the Court because they did not "address the heart of the problem:  the unpredictable nature of [his] absences."  *Id.*  "Requiring the VA to accommodate such absences," the Eleventh Circuit explained, "would place upon the agency the burden of making last-minute provisions for [the plaintiff's] work to be done by someone else.  Such a requirement would place an undue hardship on the agency."  *Id.*

Similarly, in *EEOC v. Austal USA, LLC*, the district court concluded that a plaintiff whose diabetes caused him to miss work on an unpredictable basis was not a qualified individual under the ADA where regular attendance was an essential

---

applies here because ADA and Rehabilitation Act claims are analyzed using the same legal standards.  *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021).

function of his job.  *See* 447 F. Supp. 3d 1252, 1267 (S.D. Ala. 2020).  In particular, the court found that a part-time or modified work schedule would not be a reasonable accommodation because, first, the plaintiff could not follow any work schedule on a regular basis, and second, the employer "could not be expected to hire an additional employee to be on standby to perform [his] duties whenever [he] could not come in."  *Id.* at 1268; *see also id.* (stating further that "[a]n employer is not required 'to create and fund a position as an accommodation'") (quoting *Medearis v. CVS Pharm., Inc.*, 646 F. App'x 891, 896 (11th Cir. 2016)).  Nor was additional medical leave a reasonable accommodation because it would not "solve the problem" of the unpredictable nature of the plaintiff's absences.  *Id.* at 1268-69.

This Court recently reached a similar conclusion in *Change v. Midtown Neurology, P.C.  See* No. 1:19-CV-885-SCJ-AJB, 2021 WL 2483368, at *3 (N.D. Ga. Feb. 3, 2021), *report and recommendation adopted*, 2021 WL 2492470 (N.D. Ga. Mar. 26, 2021), *aff'd*, No. 21-11405, 2022 WL 2352339 (11th Cir. June 29, 2022).  In that case, the plaintiff was terminated from employment after she missed 28 of 59 days to attend and recuperate from treatment sessions for pseudotumor cerebri.  *Id.* at *4.  The court found that the plaintiff was not a qualified individual because she was unable to perform the essential job function of "regular and reliable" attendance either with or without an accommodation.  *Id.* at *17-21

(finding that plaintiff's proposed accommodations of a one-week leave of absence or remote work were not reasonable because they would not have allowed her to perform the essential functions of her job).

Other courts in this Circuit have reached similar conclusions as well. *See, e.g., Aponte*, 2022 WL 2289646, at *11 (proposed accommodation of "leave from work" was not reasonable because it "does not allow Plaintiff to perform *any* of the essential functions of her job as being present at work is necessary to perform all other essential functions"); *Ryerson v. Jefferson Cnty. Comm'n*, No. 2:18-cv-1439-CLS, 2020 WL 6701797, at *17 (N.D. Ala. Nov. 13, 2020) (finding that proposed accommodations of a "flexible" work schedule, remote work, or being excused for missing work were not reasonable because they would not enable the plaintiff to perform the essential functions of her job); *Thomas v. Trane, A Business of Am. Std.*, No. 5:05-cv-440(CAR), 2007 WL 2874776, at *8 (M.D. Ga. Sept. 27, 2007) (finding that requested accommodation of indefinite leave periods was not reasonable because it would not address the unpredictable nature of the plaintiff's absences).

The foregoing cases are on point. Here, the parties agree that regular job attendance was an essential function of Plaintiff's nursing job and the jobs she applied for during her leave of absence. (DSUMF ¶¶ 51, 88.) The record also shows that Plaintiff could not regularly attend work without an accommodation;

more specifically, the undisputed evidence shows (1) that she used the full amount of FMLA leave during her tenure with Defendant each year; (2) that she admitted that she was not able to predict when flare-ups would occur or how long they would last; and (3) that her own doctor opined that she could not reliably attend work when she was having flare-up. (DSUMF ¶¶ 37, 52; Bodie Dep. Ex 1 [Doc. 32-1]; Pl. Dep. at 31, 109.)

Nor has Plaintiff presented evidence to demonstrate that there was a reasonable accommodation available that would allow her to perform that essential job function. "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions." *Id.* at 1255-56.

The accommodation that Plaintiff sought in this case was intermittent leave. As Plaintiff sees it, Defendant already provided her intermittent FMLA leave, which allowed her to perform the duties of her job satisfactorily and which should have continued to allow her to miss work on an as-needed basis. [Doc. 24 at 15, 19-20.] The problem with this argument is twofold. First, Plaintiff conflates the concept of intermittent FMLA leave with that of a reasonable accommodation

23

under the ADA.  "The leave provisions of the FMLA are 'wholly distinct from the reasonable accommodation obligations of employers covered under the ADA.'" *Gilliard v. Georgia Dept. of Corrs.*, 500 F. App'x 860, 865 (11th Cir. 2012) (citing 29 C.F.R. § 825.702(a)).   And, importantly, "FMLA is not a reasonable accommodation under the ADA; rather, it is a right enforceable under a separate statutory provision." *Williams v. Outokumpu Stainless USA, LLC*, No. CV 20-215-CG-MU, 2021 WL 4822832, at *12 (S.D. Ala. Oct. 15, 2021) (quoting *Trevino v. United Parcel Serv.*, No. 3:08-CV-0889-B, 2009 WL 3423039, at *12 (N.D. Tex. Oct. 23, 2009)), *appeal dismissed*, No. 21-13981-GG, 2022 WL 16907554 (11th Cir. May 25, 2022).   The Fifth Circuit has explained the statutory distinction between FMLA leave and an ADA accommodation as follows:

> An employee who requests FMLA leave asserts he has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D) ("Entitlement to leave").  A request for a reasonable accommodation under the ADA is a claim that the employee "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C.  §  12111(8)  ("Definitions: Qualified Individual").  *See Capps v. Mondelez Global LLC*, 147 F.Supp.3d 327, 340-41 (E.D. Penn. 2015) ("an employee who requests leave does not clearly communicate to her employer that she is disabled and desires an accommodation.") (quoting *Rutt v. City of Reading, Pa.*, No. CIV.A. 13-4559, 2014 WL 5390428, *4 (E.D. Pa. Oct. 22, 2014)).  Thus, an employee seeking FMLA leave is by nature arguing that he cannot perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he can perform the essential functions of the job.

*Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791-92 (5th Cir. 2017).

Under the circumstances of this case, intermittent FMLA leave is not a reasonable accommodation under the ADA, for the simple reason that it would not allow Plaintiff to attend work regularly on a predictable basis.   Because this proposed accommodation would not have allowed Plaintiff to perform the essential functions of her job, Plaintiff cannot rely on it to argue that she is a qualified individual entitled to protection under the ADA.  *Crispell v. FCA US, LLC*, No. 20-CV-10558, 2023 WL 149109, at *8 (E.D. Mich. Jan. 10, 2023) (finding that even though the employee's "inability to work during flare-ups entitled her to take intermittent FMLA leave, her periodic inability to work foreclosed her from being a 'qualified individual'" under the ADA because working a predictable schedule was an essential job function).[7]

The other primary problem with Plaintiff's argument is that even if intermittent leave can, ***in some circumstances***, be a reasonable accommodation, it is not one here because intermittent leave would cause an undue hardship on

---

[7] Plaintiff's argument that she is a qualified individual simply because she held an LPN license and performed her job satisfactorily is foreclosed by *Jackson*. In that case, even though the plaintiff satisfied the educational and experiential requirements of his position, presence on a routine basis was an essential part of his job, and since the plaintiff did not show that there was a reasonable accommodation for his unpredictable absences, he was not a qualified individual. 22 F.3d at 279.

Defendant.  Defendant has presented evidence that it was not feasible for it to have another nurse perpetually on standby to fill in if Plaintiff was absent.  It is undisputed that it was difficult to bring in PRN nurses on a moment's notice and that at the time relevant to this case, Defendant had only two PRN nurses covering eight different facilities.  (DSUMF ¶¶ 54-55.)  Bodie also testified that he did not have access to resources which would have enabled him to have a nurse available on standby to fill in immediately for Plaintiff if and when she needed to leave work suddenly.  (Bodie Decl. ¶ 6.)

Plaintiff attempts to rebut this evidence by relying on her own testimony that all nurses were on a "float list" and could be called upon to fill in.  (*See* R-DSUMF ¶ 61; Pl. Dep. at 179).  But this does not create a genuine issue of fact.  Even if all nurses were expected to fill in for absent colleagues, Defendant's evidence that it was impractical for a nurse to fill in for Plaintiff whenever she was unable to perform her job duties stands unrebutted.  Indeed, Plaintiff conceded at her deposition that she did not know how many of those nurses would have been available on any given day.  (*Id.* at 180.)  As a result, Plaintiff's proposal that someone fill in for her as-needed is precisely the sort of accommodation that the *Jackson* court found to be unreasonable.  *See* 22 F.3d at 279 (concluding that burdening the employer with "making last-minute provisions for [the employee's] work to be done by someone else . . . would place an undue hardship on the

26

[employer]"); *see also Austal*, 447 F. Supp. 3d at 1268 ("[The employer] could not be expected to hire an additional employee to be on standby to perform [the employee's] duties whenever [the employee] could not come in.").

Plaintiff attempts to distinguish *Jackson*, *Austal*, *Aponte*, *Ryerson*, and *Change*, all on the grounds that the employes in those cases were fired for excessive absences, whereas Plaintiff was not.[8]  [Doc. 24 at 12-15.]  Plaintiff's argument, however, reads their holdings too narrowly.  Those cases recognize the more fundamental proposition that when an essential function of a job includes being present at work on a reliable basis, intermittent leave from work is not a reasonable accommodation ***precisely because*** it cannot guarantee the employee's presence and therefore cannot meet the essential function of reliable attendance.  And while Plaintiff was not fired for excess absences, it is clear from her FMLA leave log and the fact that her own doctor identified in the ADA Job Accommodation Form that she would miss work on an unpredictable basis due to her conditions that she could not meet the reliable attendance requirement.

The principal cases that Plaintiff cites are also distinguishable.  She relies on *Norman v. South Guaranty Insurance Company,* 191 F. Supp. 2d 1321, 1335 (M.D.

_____

[8] Plaintiff admits that she was formally reprimanded in December 2019 for taking unauthorized leave, (DSUMF ¶ 91, R-DSUMF ¶ 91), but there is no indication that she was either placed on unpaid leave or terminated due to excessive absenteeism in violation of company policies.

Ala. 2002), for the proposition that her successful job performance and the fact she had worked for Defendant for nearly five years rendered her qualified to perform her job. [Doc. 24 at 16.] But in that case, there was a genuine issue of fact whether the essential functions of the plaintiff's job included a predicable work schedule. *Id.* at 1335 n.8 (stating that "the court is not convinced that [the plaintiff's] presence on a rigid, regular schedule was an essential component of her job"). Here, by contrast, there is no dispute that regular attendance was an essential function of Plaintiff's nursing job and all the jobs for which she applied. (*See* DSUMF ¶ 51 ("Regular attendance was an essential function of Plaintiff's LPN job under Bodie."), ¶ 88 ("For all the positions Plaintiff applied for, regular attendance was an essential job duty.").)

Likewise, *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366 (N.D. Ga. 2012), which Plaintiff cites to support her argument that "Defendant has offered no evidence that [she] took excessive leave under the FMLA" during the two years prior to her termination from employment, is distinguishable because in that case, there was a genuine issue of fact as to whether the plaintiff was actually absent on the various days her former employer claimed she was. *Id.* at 1379 ("In light of the evidence Plaintiff presents to dispute eleven of the twelve absences specifically identified by Defendants . . . the Court finds that Plaintiff has created a triable issue of fact as to whether she was not 'otherwise qualified' due to

absenteeism.").   Here, by contrast, there is no dispute that Plaintiff took her maximum amount of FMLA leave and that her absences from work were unpredictable.  (*See* Bodie Dep. Ex. 1 (FMLA usage log)); *see also Change*, 2021 WL 2483368, at *17 (distinguishing *Coker* on similar grounds).

Plaintiff also argues that Defendant violated 29 C.F.R. § 825.702(d)(1), one of the FMLA's implementing regulations, by "removing Plaintiff because it did not want to allow unstructured leave." [Doc. 24 at 16.]  That regulation, however, does not provide a basis for finding an ADA violation.  In fact, it highlights the differences between the FMLA leave and the notion of reasonable accommodations under the ADA.  Under § 825.702(d)(1), an employer may neither (1) require that an employee take a job with a reasonable accommodation in lieu of granting FMLA leave, even if the ADA may require the employer offer such a position to the employee, nor (2) change the essential functions of a job in order to deny FMLA leave.  *Id.*  But here, there is no evidence that Defendant changed the essential functions of Plaintiff's job to require attendance at work, much less in an effort to deny FMLA leave.  In fact, as will be discussed below, Plaintiff received every hour of FMLA leave to which she was entitled.  Thus, this regulation has no bearing to the analysis of the ADA claims.

Based upon the foregoing reasons, the Court finds that the undisputed record establishes that Plaintiff was not a qualified individual because she was unable to

perform the essential functions of her job—including being regularly present at work—and because she has failed to identify any reasonable accommodation that would have allowed her to perform those essential functions.   As a result, Defendant's motion for summary judgment should be **GRANTED** as to Plaintiff's discrimination and failure-to-accommodate claims under the ADA.[9]

### B.   FMLA Interference

The FMLA provides that an eligible employee[10] is entitled to a maximum of twelve weeks of leave during any twelve-month period because of, among other reasons, a serious health condition that makes the employee unable to perform the functions of her position.   29 U.S.C. § 2612(a)(1).   To protect those rights, the FMLA makes it illegal "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).   "To prove FMLA interference, an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008) (citing 29 U.S.C. § 2615(a)(1) and *Strickland v. Water Works and Sewer Bd.*

---

[9] In light of this finding, the Court need not address Defendant's alternative argument that Plaintiff's ADA claims fail on the grounds that there was no evidence that Plaintiff's disability was the but-for cause of any action it took.   *See Austal*, 447 F. Supp. 3d at 1268 (declining to consider alterative arguments for summary judgment where record established that the plaintiff was not a qualified individual).

[10] The parties do not dispute that Plaintiff was an eligible employee under the FMLA.

*of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001)).  The employee must also demonstrate that she "has been prejudiced by the violation in some way." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

Defendant argues that Plaintiff's FMLA interference claim fails because she cannot establish that she was denied any FMLA benefits before her certification expired in September 2021, and after September 2021, she did not qualify for FMLA leave because she failed to submit recertification paperwork from her doctor. [Doc. 22-1 at 23-24.]  In response, Plaintiff does not point to evidence that suggests that she was denied any FMLA benefits to which she was entitled prior to September 2021, nor does she dispute that she failed to submit the recertification paperwork necessary to qualify her for FMLA benefits for the next rolling calendar year.  (*See* DSUMF ¶ 96 ("Plaintiff never provided any kind of recertification paperwork to Kaiser after September 29, 2021.").)

Nonetheless, Plaintiff argues that Defendant interfered with her FMLA benefits in three ways.  First, she contends that she was terminated on September 1, 2021, before she could have submitted the recertification paperwork, which interfered with her attempts to take leave. [Doc. 24 at 10.]  Second, she argues that Dandy interfered her FMLA benefits by calling every hiring manager and telling them that Plaintiff needed intermittent leave, but without telling them that she was legally entitled to intermittent leave under the FMLA. [*Id*. at 11.]  Third, she argues

31

that her rights were interfered with because in September 2021, when her request for leave was denied, the denial letter failed to mention the lack of certification. [*Id.* at 11-12.]

None of Plaintiff's arguments has merit. First, Plaintiff's assertion that she was terminated on September 1, 2021 is factually incorrect. It is undisputed that Dandy and Bodie told Plaintiff on September 29, 2021 that she would be placed on leave beginning the next month to give her an opportunity to find another position with Defendant. (*See* Dandy Dep. 39; Bodie Dep. at 114; Pl. Dep. at 62-64.) Indeed, Plaintiff herself testified that she was placed on a leave of absence in September 2021. (*See* Pl. Dep. at 97-98.) And in her response to Defendant's statement of undisputed material facts, she conceded that her termination occurred in February 2022, and that until then, she was on unpaid leave. (R-DSUMF ¶ 98.) If were this not enough, Plaintiff testified that, on October 5, 2021, she understood that she had to follow up with Defendant's HR department to see if her FMLA leave had been recertified. (Pl. Dep. at 77.) As Defendant points out, a fired employee would not have continued to communicate with HR and her supervisor about potential leave. [Doc. 28 at 4.] Thus, her contention that she was fired before she could supply the recertification form is contrary to the record in this case.

Plaintiff's second argument that Dandy violated the FMLA by not telling hiring managers that Plaintiff could have intermittent FMLA available to cover

future absences fares no better.   Again, Plaintiff did not provide the required documentation to recertify FMLA leave after September 2021, which meant that during the entirety of her leave, she was not eligible to be approved for any FMLA leave.   Thus, Dandy could not have possibly interfered with her right to FMLA leave by not communicating to hiring managers that she had FMLA available to cover future absences, since Plaintiff's failure to resubmit the certification paperwork in fact made her ineligible.[11]

Finally, as to Plaintiff's third argument, it is of no moment that when Defendant denied her request for additional FMLA leave request in September 2021, it did not mention that Plaintiff had not been recertified for an additional year of leave.   The record shows that on September 27, 2021, Plaintiff requested additional FMLA leave beginning September 23, 2021, which was still within the 12-month window that Defendant had approved the previous year.   [*See* Doc. 32-4 at 1-2; Doc. 32-2 at 1-4.]   (*See also* DSUMF ¶ 18 (undisputed that Plaintiff's FMLA period only reset at the end of September).)   On October 4, 2021, Defendant's

---

[11] Plaintiff argues in passing that Dandy also interfered with her right to FMLA leave by trying to "convince her to take a part-time position ineligible for FMLA." [Doc. 24 at 11.]  Plaintiff testified that she did not recall applying for any part-time position because she knew that it would "affect her FMLA privileges." (Pl. Dep. at 85.)  Since Plaintiff did not rely on Dandy's suggestion to consider part-time work, Dandy's encouragement could not possibly have had any effect on her ability to exercise her rights under the FMLA.

National HR service center wrote to Plaintiff to explain that her request had been denied because she had exhausted her 12-week leave entitlement. [Doc. 32-4 at 2.] Plaintiff presents no evidence that suggests she still had FMLA leave available when she applied in September 2021, and as a result, there is nothing in the record to support her argument that her leave request was denied because she had failed to provide recertification paperwork. As a result, it actually makes sense that the denial letter did not discuss her lack of certification as a reason for the denial, since it was not.[12]

At bottom, Plaintiff's interference claim fails because she indisputably received all the FMLA leave to which she was entitled. *Giles v. Daytona State Coll., Inc.*, 542 F. App'x 869, 875 (11th Cir. 2013) (per curiam) ("The record confirms that [the plaintiff] used all of her available FMLA leave on June 22, 2009, and thus, there is no evidence that she was denied an FMLA benefit to which she was entitled."); *Edwards v. WellStar Med. Grp., LLC*, No. 1:18-CV-4492-MHC-LTW, 2020 WL 6293153, at *10 (N.D. Ga. May 15, 2020) ("Because the record

---

[12] The Court pauses to note that in Plaintiff's response brief, she writes that around September 27, 2021, she asked Bodie "to send in a request to renew her FMLA leave." [Doc. 24 at 5.] In support, she cites the October 4 denial letter from Defendant. [*Id.*] To be clear, that letter does not indicate that Plaintiff's "request to renew" was a request to *recertify* her FMLA leave for an additional calendar year. Rather, it appears from the face of the October 4 letter that Plaintiff simply requested additional FMLA leave.

establishes that Plaintiff used all of her FMLA leave prior to her termination . . . a reasonable jury could not find that Plaintiff was denied a benefit under the FMLA to which she was entitled."), *report and recommendation adopted*, 2020 WL 6156566 (N.D. Ga. Sept. 8, 2020), *aff'd*, 2022 WL 3012297 (11th Cir. July 29, 2022). Therefore, summary judgment should be **GRANTED** in favor Defendant on Plaintiff's FMLA interference claim.

### C.    ADA and FMLA Retaliation

The Court finally takes up Plaintiff's claims for retaliation under the ADA and the FMLA.[13]  Both the ADA and the FMLA prohibit an employer from retaliating against an employee for exercising her rights under those acts.  *See* 29 U.S.C. § 2615(a)(1)-(2); 42 U.S.C. § 12203(a).  Where, as here, there is no direct evidence of retaliatory animus, the Court analyzes ADA and FMLA retaliation claims under the familiar *McDonnell Douglas*[14] burden-shifting framework.  *See Batson v. Salvation Army,* 897 F.3d 1320, 1328 (11th Cir. 2018) (evaluating ADA and FMLA retaliation claims together).  Under that framework, an employee must first demonstrate a prima facie case of retaliation by showing "(1) that she engaged

---

[13] The Court's finding that Plaintiff is not a qualified individual under the ADA does not dispose of her ADA retaliation claim because a plaintiff need not be qualified individual, or even disabled, to assert a retaliation claim under the ADA. *See Branscomb v. Sec'y of Navy,* 461 F. App'x 901, 906 (11th Cir. 2012).

[14] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

in statutorily protected conduct, (2) that she suffered an adverse employment action, and (3) that a causal connection exists between the two." *Id.* Next, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Id.* If the employer provides such a reason, "the burden shifts back to the employee to demonstrate that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* (citation omitted)

Here, Defendant argues that Plaintiff was terminated because she failed to secure a job consistent with her medical limitations and that she was denied FMLA leave because she failed to submit the required documentation to become eligible for FMLA leave after September 2021. [Doc. 22-1 at 24.] Meanwhile, Plaintiff responds that she can establish a prima facie case of retaliation because she engaged in protected activity when she submitted paperwork in September 2021 from her doctor that showed she needed intermittent leave; that she suffered an adverse employment action when, just two weeks later, she was "removed and placed on forced leave, which was a termination since she was not permitted to return to her former position"; and there was a close temporal connection between the two. [Doc. 24 at 23.] She also argues that a jury could find Defendant's reasons pretextual because Dandy and Bodie gave conflicting reasons for placing her on

leave: namely, that Dandy explained that Plaintiff's request for intermittent leave was "a problem" due to staff shortages, whereas Bodie said that Plaintiff's doctor's letter indicated she could not do the job. [*Id*. at 23-24.] She further contends that Dandy's and Bodie's reasons were also inconsistent with fact that she performed her job successfully for four years using intermittent FMLA leave. [*Id.* at 24.]

Because Defendant does not appear to contest that Plaintiff can make out a prima facie case of retaliation under either the ADA or the FMLA, the Court assumes that she can and proceeds directly to whether Plaintiff has demonstrated that Defendant's proffered reasons for placing her on leave and ultimately terminating her employment were pretext for retaliation.[15] A plaintiff can satisfy her burden to demonstrate that the defendant's true motivation was retaliatory by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021) (quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)). And since the

---

[15] The Court pauses to note that Plaintiff's contention that her being placed on leave was a termination from employment is incorrect. As discussed above, her employment was not terminated until February 2022, after she failed to secure an alternative position. Even so, the Court assumes that her being placed on unpaid leave and her subsequent termination from employment were both adverse employment actions for purposes of establishing a prima facie case of retaliation.

plaintiff bears the ultimate burden to show retaliation, in doing so, she "must meet the employer's reason head on and rebut it, and may not simply quarrel with the wisdom of the reason." *Jefferson v. Burger King Corp.*, 505 F. App'x 830, 833-34 (11th Cir. 2013); *see also Alvarez*, 610 F.3d at 1265-66.

As a preliminary matter, it is not clear what evidence Plaintiff relies on to support her assertions that Dandy and Bodie gave conflicting reasons for placing Plaintiff on leave, as she does not cite any evidence in that portion of her response brief.  [*See* Doc. 24 at 23.]  Most glaringly, Plaintiff writes in her brief that Dandy "admitted" that Plaintiff was removed from her position because her need for intermittent leave was "a problem" for Defendant.  [*Id.*]  The Court has been unable to locate where Dandy characterized the need for intermittent leave as "a problem."[16]

In any event, as best the Court can tell, the purported inconsistent explanations on which Plaintiff bases her pretext argument are as follows.  On the one hand, Dandy testified that the business unit's view was that Plaintiff's request for unstructured intermittent time off was "an issue," given the nursing staff shortages during the pandemic.  (Dandy Dep. at 35 (stating that "to not have nursing

---

[16] The index to Dandy deposition notes only two instances when Dandy used the term "problem" or "problems," and neither pertain to Plaintiff's use of leave. (*See Dandy Dep.* at 29, 122, Index p.22.)

staff there and not knowing from day-to-day if nursing staff would be available to meet the need of [patients] needing to be seen on a day-to-day basis would pose a business concern").)   On the other hand, Bodie testified that when he read the limitations that Dr. del Mazo identified, he concluded that they would interfere with Plaintiff being able to perform the functions of her job as an ambulatory nurse; and as a result, she was placed on leave to find another position within the organization. (Bodie Dep. at 100, 114-15.)

But contrary to Plaintiff's argument, this testimony is complimentary—not inconsistent—and it certainly does not raise a reasonable inference that Bodie, Dandy, or anyone else was motivated by retaliatory intent.   Bodie's testimony indicates that he understood the limitations that Dr. del Mazo identified to interfere with Plaintiff's ability to perform the LPN job.   Those limitations, of course, manifested when Plaintiff experienced a flare-up of her symptoms.   In turn, the only way to accommodate those unexpected flares was to allow Plaintiff to take leave, which presented a problem—which Dandy identified in her testimony— because regular job attendance was an essential function of the job.   So, even viewing the evidence in the light most favorable to Defendant, the reasons that Dandy and Bodie gave for placing Plaintiff on leave do not challenge the veracity of Defendant's articulated reasons or reasonably support a finding that retaliation

was the true reason for placing her on leave and ultimately terminating her employment.

Likewise, Plaintiff's contention that she performed her job well when she was at work does not meet Defendant's articulated non-retaliatory reasons head-on for the simple reason that Plaintiff was not placed on leave or fired because of issues relating to the performance of her job. *Cf. Batson*, 897 F.3d at 1330 (finding that employee's history of excellent performance reviews created issue of fact as to whether defendant's refusal to rehire her based on purported deficient job performance was pretext). Thus, the fact that Plaintiff performed her job well during the times that she was present is simply insufficient to rebut Defendant's stated reasons.

Accordingly, Defendant's motion for summary judgment should be **GRANTED** as to Plaintiff's ADA and FMLA retaliation claims.

## IV.   CONCLUSION

In sum, the Court finds that Defendant's motion for summary judgment should be granted in full. Specifically, Plaintiff's ADA discrimination and reasonable accommodation claims (Counts 1-3) fail because it is undisputed that Plaintiff was unable to perform an essential job function—namely, being regularly present at work—either with or without a reasonable accommodation and, therefore, she was not a qualified individual protected by the ADA. Her FMLA interference

claim (Count 5) fails because she received all the FMLA leave to which she was entitled.  And her ADA and FMLA retaliation claims (Counts 4 and 6) fail because Plaintiff cannot show that Defendant's reasons for placing her on leave and terminating her employment were pretext for retaliation.  Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment [Doc. 22] be **GRANTED**.

IT IS SO RECOMMENDED this 4th day of October, 2023.

_____
JOHN K. LARKINS III
United States Magistrate Judge